United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN GROBLER,<br>    Plaintiff,<br>    v.<br>APPLE INC.,<br>    Defendant. | Case No. 12-cv-01534-JST<br><br>**ORDER CONSTRUING CLAIMS OF UNITED STATES PATENT NO. 6,799,084** |

Plaintiff Benjamin Grobler filed this action against Apple Inc. asserting infringement of Grobler's United States Patent No. 6,799,084 ("'084 Patent") by Apple's "iTunes system." Apple denied infringement and counterclaimed for declaratory judgment of non-infringement and invalidity of the '084 Patent. On April 28, 2014, the Court held a hearing for the purpose of construing disputed terms in the claims of United States Patent No. 6,799,084.

The Court now construes the terms as set forth below.

**I.    LEGAL STANDARDS**

    **A.    Claim Construction**

The construction of terms found in patent claims is a question of law to be determined by the Court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Consequently, courts construe claims in the manner that "most naturally aligns with the patent's description of the invention." Id.

The first step in claim construction is to look to the language of the claims themselves. "It

is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips, 415 F.3d at 1312 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in light of its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312. In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily apparent, and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. Claim construction may deviate from the ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and acts as her own lexicographer, or (2) the patentee disavows the full scope of a claim term either in the specification or during prosecution. Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Ordinary and customary meaning is not the same as a dictionary definition. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." Phillips, 415 F.3d at 1321. Typically, the specification "is the single best guide to the meaning of a disputed term." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is therefore "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of claims." Phillips, 415 F.3d at 1315. However, while the specification may describe a preferred embodiment, the claims are not necessarily limited only to that embodiment. Id.

Finally, courts may consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Expert testimony may be useful to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is

2

consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318. However, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." Id. If intrinsic evidence mandates the definition of a term that is at odds with extrinsic evidence, courts must defer to the definition supplied by the former. Id.

### B. Means-Plus-Function Claims

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6.[1] This provision is "intended to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus." O.I. Corp. v. Tekmar Co., Inc., 115 F.3d 1576, 1583 (Fed. Cir. 1997). But the flip side of this coin is that the patentee cannot make "open-ended functional claims . . . which effectively purport to cover any and all means so long as they perform the recited functions." Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1256, n.7 (Fed. Cir. 2008). "[I]n order for a claim to meet the particularity requirement of [§ 112 ¶ 2], the corresponding structure(s) of a means-plus-function limitation must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation." Atmel Corp. v. Info. Storage Devices, Inc., 198 F.3d 1374, 1382 (Fed. Cir. 1999). "Otherwise, one does not know what the claim means." Id. "[A] bare statement that known techniques or methods can be used does not disclose structure." Biomedino, LLC, v. Waters Techs. Corp., 490 F.3d 946, 952 (Fed. Cir. 2007). The "duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1300–02 (Fed. Cir. 2005).

---

[1] Section 112, paragraph 6 ("Paragraph 6") was re-styled subdivision (f) as part of the Leahy-Smith American Invents Act, effective September 16, 2011. Pub. L. 112-29. Because the '084 Patent was filed before then, the Court refers to Paragraph 6.

3

"A challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1319 (Fed. Cir. 2003). If the patent does not disclose adequate structure, the claim is invalid for failing to particularly point out and distinctly claim the invention as required by 35 U.S.C. § 112 ¶ 2. In re Donaldson Co. Inc., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc).

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims," and "like claim construction, [it] is a question of law." Atmel, 198 F.3d at 1378. Therefore, it is appropriate for the Court to address indefiniteness issues at the claim construction stage. See Exxon Research and Eng'g Co. v. U.S., 265 F.3d 1371, 1376 (Fed. Cir. 2001).

## II. ANALYSIS

The '084 Patent relates to the distribution of digital music, video, or computer programs. The invention is a "data vending system" directed to two problems in the prior art: (1) the unauthorized copying of data and (2) the limitations of data distribution systems "in that if the data is lost or damaged the authorised user has to again purchase an authorised copy from the copyright owner or a licensed vendor." '084 Patent at col. 1:13–42. The patent observes that the latter "problem is particularly acute with data carried on magnetic or optical media such as tapes, diskettes, compact disks (CD's) and Digital Video Disks (DVD's), which are prone to loss and/or damage." Id. 1:39–42. Asserted Claim 1 recites:

> A data vending system including:
>
> a data depot for storing one or more data types selected from the group consisting of digitized music, analog music, video, games, information, and computer programs;
>
> a data dispensing device in communication with the data depot;
>
> a uniquely identifiable **recordable data carrier** configured for

4

        recording data from the data dispensing device;

        a database for keeping a record of the data recorded by a user onto said data carrier, at least a part of which database is stored remotely from said data carrier,

        wherein the database also maintains at least one of owner and possessor records for each said data carrier selected from the group consisting of ownership history of the data carrier, possession history of the data carrier, personal details of the past and present owner and possessor of the data carrier, demographic data about the user and owner of the data carrier, data recorded onto the data carrier at an authorized data dispensing device, data rented and the rental period, the user's normal requirements, the user's payment records, royalties paid to the copyright owner by the user, and favorite data of the user;

        wherein the data carrier is a multiple use **recordable data carrier** which includes **key means** for at least one function selected from activating the data carrier for receiving data, deactivating the data carrier for receiving data, activating the data carrier for releasing data, and deactivating the data carrier for releasing data, wherein the **key means** includes at least one of a hardware key and a software key linked to a microprocessor operatively associated with a data carrier; and

        wherein the data dispensing device is provided with a **verification mechanism** for verifying the authenticity of the **key means**.

Asserted Claim 4 is substantially the same, except for minor changes in wording; the last two "wherein" clauses of Claim 1 are replaced with:

        wherein the **recordable data carrier** is configurable to permit reading of the data stored thereon for a predetermined period of time only, whereafter the data is processed in at least one way selected from marked as stale and later deleted, deleted immediately, and scrambled.

The parties dispute the scope of Claim 1 and 4 in connection with the terms "recordable data carrier," "key means," and "verification mechanism."[2]

---

[2] The parties have stipulated to the following construction of the term "data depot": "a device or devices on which data to be distributed is stored or from which such data is made available." See ECF No. 88 at 14.

### A. "recordable data carrier"

| Disputed Claim Term | Grobler's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "recordable data carrier" | "a device on which data can be recorded" | "a device that carries recorded data to the separate reader device" |

The parties' dispute over the term "recordable data carrier" centers on the question of whether the data carrier must be separate from the "reader device" disclosed by the specification.

Grobler argues that his construction of "recordable data carrier" — "a device on which data can be recorded" — represents the plain meaning of the term and is consistent with the specification. Apple agrees that data is written or transferred onto the data carrier, but argues that the specification distinguishes a "recordable data carrier" from a "data reader." The Court agrees.

The specification repeatedly and consistently discusses the recordable data carrier as a separate element from the data reader throughout. For example, in describing its single figure, the patent provides: "The recordable data carrier **32**[3] is configured to receive data only from a data dispensing device **20**, **22**, **24**, authorised for a particular data carrier **32** i.e. at the premises of an authorised vendor **14**, **16**, **18**, and to be read by any suitable reader, for example, a home entertainment centre **34**." Id. 5:1–5. The phrasing of this passage implies that it is both a description of the single embodiment of the patent and that it describes the invention as a whole. Examples of recordable data carriers described in the patent include "a removable hard disk, a CD-ROM, a DVD, flash memory, an eeeprom, or the like.[¶] One envisaged embodiment is a cassette holding a number of CD-ROMs and a controller for performing the other functions, and managing the data on the CD-ROMs." Id. 4:52–57. Each of these embodiments have in common the fact that they must be read by another device — which is further evidence in support of Apple's construction. Finally, in the patent's single figure, the data carrier and data reader are depicted separately; the data reader 34 is depicted as a "home entertainment centre" separate from the data

---

[3] The "data carrier" is consistently referred to in the patent as item 30. This reference to item 32 appears to be a typographical error.

carrier 30. See Fig. 1.



**Figure 1**

Grobler argues that a separation between carrier and reader is not required, citing to the following paragraphs for support:

> The recordable data carrier *may* be configured to be read by a data carrier reader authorised for a particular data carrier or a particular class of data carrier.
>
> However, the recordable data carrier *may* be configured for receiving data from certain authorised data dispensing devices but to be read by any suitable reader, for example, a home entertainment centre.

Id. 3:21–27 (emphasis added). But these paragraphs support Apple's position, not Grobler's. Read together, the two paragraphs draw a distinction between data carriers configured to be read by a "reader authorised for a *particular* data carrier or *particular* class of data carrier" on the one hand, and a data carrier that may be read by "*any suitable reader*, for example, a home entertainment centre" on the other. Id. (emphasis added). In *both* embodiments, the reader is a separate element from the carrier. Indeed, the specification "repeatedly, consistently, and exclusively" describes the data carrier and reader as separate elements of the claimed invention, dictating adoption of Apple's proposed construction. In re Abbott Diabetes Care Inc., 696 F.3d 1142, 1150 (Fed. Cir. 2012) (quoting Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("'Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents."); see also Hologic, Inc. v. SenoRx, Inc., 639 F.3d 1329, 1338 (Fed. Cir. 2011) (implying limitation where "the specification, including the

7

figures, consistently and exclusively" disclose limitation). Every example and embodiment described in the patent is consistent with Apple's construction; none support Grobler's.

Grobler makes a claim differentiation argument based on the separate "data carrier reader" limitation of Claim 2, arguing that the separation of the two devices in Claim 2, when compared with the absence of any mention of a "data carrier reader" in Claims 1 and 4, means that no separation is required. There are two problems with Grobler's claim differentiation argument. First, in order for claim differentiation to apply, there must be otherwise be identity between the claims to be differentiated, which ordinarily only applies in the context of independent and dependent claims. See Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (rejecting claim differentiation argument because claims were not "otherwise identical."); Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Second, and more importantly, although the separate reader term does not appear in the asserted claims, the "recordable data carrier" term appears in both the asserted claims and Claim 2, and a claim term "cannot be interpreted differently in different claims because claim terms must be interpreted consistently." Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579 (Fed. Cir. 1995) (citing Fonar Corp. v. Johnson & Johnson, 821 F.2d 627, 632 (Fed. Cir. 1987), cert. denied, 484 U.S. 1027 (1988)). The distinction between the data carrier and the data reader of Claim 2 must therefore carry over to the uses of the term "recordable data carrier" in Claims 1 and 4.[4]

Finally, extrinsic evidence confirms the definition supplied by the specification and claim language. Apple's expert, Dr. John Kelly, opines that a person of ordinary skill in the art would understand "recordable data carrier" to refer to a medium for transporting data, or from which data is read by a separate device. See Kelly Decl., ECF No. 88-4 ¶¶ 30–44. An authoritative

---

[4] Contrary to Grobler's reply argument, the Court does not read into Claims 1 and 4 a "data reader" limitation. The parties' dispute is over the scope of the term "recordable data carrier," and the Court agrees with Apple that the "recordable data carrier" cannot also be the invention's "data reader." Whether a "data reader" is an element of Claims 1 and 4 is a separate question.

8

dictionary in this area confirms Dr. Kelly's conclusion, as it defines the term "data carrier" as

> Material that serves as a data medium or to which a data medium is applied, and that is designed to facilitate the transport of data; for example, a punch card or paper tape; a disk, drum, tape, or employee badge with a magnetizable surface that serves as the data medium.

IBM Dictionary of Computing (10th ed. 1994) at 166–67, ECF No. 88-3.

At oral argument, Grobler conceded that a "data carrier reader" is a separate "component" of the invention from the "recordable data carrier," but argued that his construction must nevertheless be adopted because Apple's construction impermissibly separates the "component" into a "separate device." That argument is belied by Grobler's proposed construction itself, which provides that the "recordable data carrier" is a "device." If the "recordable data carrier" is a "device" separate from the "data reader" of the invention, as Grobler conceded at oral argument, then Grobler's use of the term "separate component" rather than the term "separate device" appears to be purely semantic. To the extent that the parties have a true dispute over the difference between a "component" and a "device," that dispute is not properly before the Court.

For the foregoing reasons, the Court adopts Apple's proposed construction of the term "recordable data carrier" as it appears in Claims 1 and 4: "a device that carries recorded data to the separate reader device."

**B.     "key means"**

| Disputed Claim Term | Grobler's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "key means" | "a physical device or software module, linked to a microprocessor, that controls access to the data carrier and/or data" | Indefinite pursuant to 35 U.S.C. §§ 112 ¶¶ 2 and 6 for failure to disclose a structure for "activating the data carrier for receiving data, deactivating the data carrier for receiving data, activating the data carrier for releasing data, and deactivating the data carrier for released data" |

Apple contends that "key means" is a means-plus-function limitation of Claim 1, the

function being "for at least one function selected from activating the data carrier for receiving data, deactivating the data carrier for receiving data, activating the data carrier for releasing data, and deactivating the data carrier for releasing data."

"The use of the word 'means' triggers the presumption that the limitation is a means-plus-function term, but that presumption may be rebutted if the claim itself recites sufficient structure for performing the function." Lighting Ballast Control LLC v. Philips Electronics N. Am. Corp., 744 F.3d 1272, 1306 (Fed. Cir. 2014) (quotation omitted). Here, the presumption applies because the claim term includes the word "means." But the same claim element recites: "wherein the key means includes at least one of a hardware key and a software key linked to a microprocessor operatively associated with a data carrier." Grobler argues that the term "key" coupled with this phrase discloses sufficient structure to rebut the presumption because a "key" is a term of art known by one of ordinary skill to cover a particular class of structures.

"[T]he presumption is not conclusive." Sage Products, Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1427 (Fed. Cir. 1997). "[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format." Id. The Federal Circuit "require[s] only that the claim term be used in common parlance or by ordinarily skilled artisans to designate *sufficiently definite* structure, 'even if the term covers a broad class of structures.'" Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1365 (Fed. Cir. 2013) cert. denied, 134 S. Ct. 900 (2014) (quoting Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1360 (Fed. Cir. 2004)). However, the Federal Circuit has made clear that the disclosed structure must be sufficient to perform the function "*in its entirety*." Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1375 (Fed. Cir. 2003) (emphasis added).

Grobler relies primarily on its expert in arguing that "key means" refers to a category of structures that were well understood in the art at the time of the patent. Grobler's expert, David Klausner, explains that in the relevant time period, "hardware key" and "software key" had commonly understood meanings. Klausner Decl., ECF No. 63-3 ¶ 20. "Specifically, a 'hardware key' refers to a physical device that is used to gain access to a computer or software running on

that computer, much like a traditional key is used to open up a lock on a door or other object. Similarly, a 'software key' refers to computer code that performs the same function as a 'hardware key' but without the need for a physical object as a 'key.'" Id. The Microsoft Computer Dictionary (4th ed. 1999), for example, defines a "hardware key" as "[a] security device connected to an input/output port to permit the use of a particular software package on that computer," or "[a]ny physical device used to secure a computer system from unauthorized access, such as the lock on the front of the cabinet of some personal computers." At his deposition, Klausner testified that the "key means" element "appears to cover for one of ordinary skill in the art all the structures that would function to . . . activate, deactivate accordingly . . . ." Klausner Dep., ECF No. 63-4 at 20:3–6. But Klausner failed to identify any specific structure for a "software key," and Grobler has not presented any evidence concerning the understanding of a person of ordinary skill in the art with respect to that term.

Consistent with Klausner's opinion, the claim language refines the claimed structure as including "at least one of a hardware key and a software key linked to a microprocessor operatively associated with a data carrier." In addition, the specification discloses examples of a "key means." See '084 Patent at col. 4:61–64 ("Typically this functionality will be performed with the use of PIN (Personal Identification Numbers) or passwords, or the like, cell-phone fashion."). The patent's cited references also include exemplar structure of the "key means." See U.S. Patent Nos. 4,725,977 ("security lock" connected to central processing unit of "remote programming terminal" used to restrict access to terminal to those with keys); 5,758,069 ("licensing system" controls access to network applications through "activation key," which may be encrypted software key or hardware security device such as a "dongle"); 5,757,908 (method and apparatus for securing access to files stored in media through encryption scheme involving keys).

Grobler contends that further description of structure is not required, relying on Flo Healthcare Solutions, LLC v. Kappos, 697 F.3d 1367, 1374 (Fed. Cir. 2012). There, the Federal Circuit held that the term "height adjustment mechanism" did not invoke § 112 ¶ 6 because the term "designate[s] a class of structures that are generally understood to persons of skill in the art"

11

for performing the claimed function: "altering the height of the horizontal tray ." Id. In addition, the patent disclosed a number of examples of height adjustment mechanisms, such as a gas-spring mechanism, a rack and pinion mechanism, a cable and pulley mechanism, and others. Similarly, in Envirco Corp. v. Clestra Cleanroom, Inc., 209 F.3d 1360, 1365 (Fed. Cir. 2000), the term "second baffle means" disclosed sufficient structure for performing the function "for directing the airflow from said centrifugal fan means inwardly of said primary housing and between said first baffle means and said filter means" because the term "baffle" itself is a structural term, defined in general purpose dictionaries as "a surface which deflects air." Id. Further, the claim language itself recited structure for the claimed baffle ("having inner surfaces for directing airflow . . . radially outward . . . and thereafter . . . between said first baffle means and said air filter means"), which conflicted with the statutory requirement that means-plus-function claim elements claim a function "without the recital of structure." Id.

Both Flo and Envirco are distinguishable, however, from the present case. In Flo, the claimed "height adjustment mechanism" was not subject to the presumption in favor of means-plus-function construction. Flo, 697 F.3d at 1374. Given that, the Federal Circuit was unwilling to apply § 112 ¶ 6 unless "the limitation essentially is devoid of *anything* that can be construed as structure." Id. Second, the patent disclosed a number of examples of height adjustment mechanisms, and a "height adjustment mechanism" was understood by one of skill in the art to perform the claimed function. Id. at 1374–75. Similarly, in Envirco, the claimed "second baffle means" was understood by one in the art to perform the claimed function, and the claim language itself refined that structure to match it to the function at issue.

The more relevant case here is Altiris. In that case, the claim term "means of booting" for "booting a digital computer" was accompanied by apparently structural language: "said means of booting including a first set of commands, said first set of commands resident on said storage device of said digital computer for booting said digital computer, and a second set of commands resident on a storage device external to said digital computer." Altiris, 318 F.3d at 1375. Nevertheless, the Federal Circuit found that the recitation of "commands" did not disclose sufficient structure to perform the entirety of the booting function, for two reasons. First, the use

12

of the term "including," an "open term," meant that the disclosed structure was not, by itself, sufficient because "something else is needed" to perform the function. Id. at 1376. Second, the Federal Circuit observed that "merely pointing out that the relevant structure is software rather than hardware is insufficient . . . . [B]ecause "commands" (*i.e.,* software) is so broad as to give little indication of the particular structure used here and is described only functionally, one must still look to the specification for an adequate understanding of the structure of that software." Id.

Here, it may be that the term "key," like the term "baffle" in Envirco, and the term "height adjustment mechanism" in Flo, is one well understood and connotes sufficient structure to one of ordinary skill in the art to perform some general function not at issue in this case, but the patent claims a group of specific functions; the "key means" of the invention performs "at least one function selected from activating the data carrier for receiving data, deactivating the data carrier for receiving data, activating the data carrier for releasing data, and deactivating the data carrier for releasing data." There is no evidence before the Court that a person of ordinary skill in the art would know, based on the invocation of the term "key," how to utilize the class of structures described by Klausner to activate or deactivate a data carrier for receiving or releasing data. Apple's expert, Dr. Kelly, opines that the term "key" was known in the art as a "functional term that generally refers to the functions of locking and unlocking." Kelly Decl. ¶ 55. According to Dr. Kelly, the coupling of the term "key means" with the recited function would not have signaled to one skilled in the art any specific structure for performing the function. Id.

Indeed, the claimed function is one of the novel aspects of the invention, as the inventor sought to address the twin problems of "unauthorized copying of data," '084 Patent at col. 1:14, and the loss or damage to single-use authorized copies of information, id. 1:35–42. Simply pointing to "hardware" and "software" as structure is not enough in light of the particularity of the function at issue. The structure of a "key means" known to one of skill in the art, or disclosed by the claim language, must be able to perform the function "in its entirety" in order to overcome the presumption. Altiris, 318 F.3d at 1375. Grobler has not overcome that presumption.

Further supporting the Court's conclusion is the little structure that is disclosed by the claim language. "[T]he key means includes at least one of a hardware key and a software key

13

linked to a microprocessor operatively associated with a data carrier." The use of the word "includes" implies, as it did in Altiris, that more structure is necessary, but the claim language does not disclose it. Dr. Kelly states that the recitation of "hardware key," "software key," and a "microprocessor" does not amount to sufficient structure for one skilled in the art to perform the function because the recitation lacks algorithms and details on how the hardware or software are "linked" to the microprocessor. Id. ¶ 56.

Because the Court concludes that the term "key means" is governed by § 112(6), the Court must also conclude that Claim 1 is invalid as indefinite pursuant to 35 U.S.C. § 112 ¶¶ 2, 6, because the specification lacks an adequate disclosure of structure. Although the patent discloses the generic examples of using PINs or passwords in "cell-phone fashion," nothing in the patent discloses the structure of those or any other implementations of "key means." See Ergo Licensing, LLC v. CareFusion 303, Inc., 673 F.3d 1361, 1364 (Fed. Cir. 2012) ("Although one of skill in the art may have been able to find a structure that would work, that does not satisfy § 112 ¶ 6. Under § 112 ¶ 6, a patentee is only entitled to 'corresponding structure ... *described in the specification* and equivalents thereof,' not any device capable of performing the function."); Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1340–41 (Fed. Cir. 2008) ("[s]imply reciting 'software' without providing some detail about the means to accomplish the function is not enough" to satisfy § 112, ¶ 6).

Further, "computer-implemented means-plus-function limitations . . . must disclose a special purpose computer as corresponding structure—*i.e.,* a computer programmed to perform a disclosed algorithm." TecSec, Inc. v. Int'l Bus. Machines Corp., 731 F.3d 1336, 1348 (Fed. Cir. 2013). An algorithm may be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." Finisar, 523 F.3d at 1340. The '084 Patent does not disclose an algorithm for the performance of the recited function in any of these forms. There is, in fact, no recitation of structure at all. That the function may also be performed by a "hardware key . . . linked to a microprocessor operatively associated with a data carrier" does not take it out of the ambit of the algorithm rule because the implementation of any "hardware key" means of performing the function would necessarily

14

require a software implementation as well. The "key means" "is essentially a black box that performs a recited function. But how it does so is left undisclosed." Blackboard, Inc. v. Desire2Learn Inc., 574 F.3d 1371, 1383 (Fed. Cir. 2009). See also Function Media, L.L.C. v. Google, Inc., 708 F.3d 1310, 1318 (Fed. Cir. 2013).

For the foregoing reasons, the Court concludes that Grobler has failed to rebut the presumption that "key means" is governed by § 112(6), and that the patent fails to disclose sufficient structure, rendering Claim 1 invalid as indefinite.

### C. "verification mechanism"

| Disputed Claim Term | Grobler's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "verification mechanism" | "a mechanism that determines the authenticity of the key means" | Indefinite pursuant to 35 U.S.C. § 112 ¶¶ 2 and 6 for failure to disclose a structure for "verifying the authenticity of the key means" |

The "data dispensing device" of Claim 1 "is provided with a verification mechanism for verifying the authenticity of the key means." The parties dispute whether "verification mechanism" is a means-plus-function limitation. Although the Court presumes that the absence of the term "means" indicates the term is not governed by § 112 ¶ 6, the Federal Circuit has observed that "the generic term 'mechanism' standing alone may connote no more structure than the term 'means.'" Flo, 697 F.3d at 1374. For this reason, claims using the term "mechanism" have sometimes been treated as means-plus-function claims by the Federal Circuit. See Welker Bearing Co. v. PHD, Inc., 550 F.3d 1090, 1096 (Fed. Cir. 2008) (quoting Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1360 (Fed. Cir. 2004) ("[T]he unadorned term 'mechanism' is 'simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term "means for."'"); Massachusetts Inst. of Tech. & Electronics For Imaging, Inc. v. Abacus Software, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure.").

15

The claim language discloses no structure for the term "verification mechanism." In its decision to institute *inter partes* review of Claims 1 and 4 of '084 Patent as anticipated and Claim 1 as obvious, the Patent Office came to the same conclusion: "The specification provides no description of the structure of the verification mechanism."[5] Nevertheless, Grobler argues that the "verification mechanism" of the invention is not a means-plus-function limitation, and that it should be construed as "a mechanism that determines the authenticity of the key means" – itself a functional construction that fails to disclose any structure.

As with "key means," Grobler argues that "verification mechanism" is a term well understood in the art. Grobler provides little evidence, either intrinsic or extrinsic, to support his position. The patent never describes the "verification mechanism," instead disclosing it and claiming it purely in functional terms as a mechanism that verifies the "authenticity of the key means." The claim language also recites no structure. And Grobler himself appears to evince confusion regarding the purpose of the verification mechanism. In his claim construction brief, Grobler suggests that the PIN and password examples disclosed by the patent are the verification mechanism. See ECF No. 63 at 17:24–28. But they cannot be; the PIN and password are alternative embodiments of the "key means." See '084 Patent at col. 4:58–64.

Grobler and Klausner suggest that examples of a "verification mechanism" are disclosed in the patents cited by the '084 Patent, but those patents do not use the term "verification mechanism," and Grobler has supplied no other evidence that the term is used by anyone skilled in the art. The entirety of Grobler's extrinsic evidence is Klausner's opinion that "the 'verification mechanism' is something that is related to the 'key means' and serves to verify the authenticity of the 'key means.'" Klausner Decl. ¶ 35. But the practice of claiming "something," *i.e.*, a "black box," that performs a function, such as to "verify the authenticity of the 'key means'" is expressly

---

[5] The PTO, noting that it would not address "issues which may arise under 35 U.S.C. § 112," and for purposes of the *inter partes* review only, construed "verification mechanism" as "any hardware or software approach to verifying that the received key is authentic." The Court notes that the construction was adopted under the PTO's "broadest construction reasonable" standard dictated by 37 C.F.R. § 42.100(b).

16

1 governed by § 112 ¶ 6.

Because the Court concludes that "verification mechanism" is a means-plus-function limitation, and because no structure whatsoever is disclosed by the patent,[6] the Court must conclude independently with respect to the term "verification mechanism" that Claim 1 is invalid as indefinite pursuant to 35 U.S.C. § 112 ¶¶ 2, 6.

### III. CONCLUSION

For the foregoing reasons, the Court finds Claim 1 invalid as indefinite because the patent fails to disclose sufficient structure related to the "key means" and "verification mechanism." The Court adopts Apple's proposed construction of the "recordable data carrier" of Claim 4 (and Claim 1): "a device that carries recorded data to the separate reader device."

**IT IS SO ORDERED.**

Dated: May 6, 2014

JON S. TIGAR
United States District Judge

---

[6] To the extent that the "verification mechanism" of Claim 1 is implemented via software, and it appears that such an implementation method is necessary, the algorithm rule discussed in connection with the term "key means" applies as well, and provides further support for the Court's conclusion that Claim 1 is invalid as indefinite due to the use of the term "verification mechanism." See Part II.B, *supra*.